**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHELLE CORKUM and MARTIN PESCE, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>JANNEY MONTGOMERY SCOTT LLC,<br><br>*Defendant*. | Case No. 2:26-cv-03944-JMY<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Michelle Corkum and Martin Pesce ("Plaintiffs"), by and through their undersigned counsel, individually and on behalf of all members of the below-defined class (the "Class"), bring this action against Janney Montgomery Scott LLC ("Janney" or "Defendant"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) contracts between the parties and other documents in Plaintiffs' possession; (b) public documents created and distributed by Defendant; and (c) publicly available information concerning Defendant. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a class action that arises out of Janney's dramatic under-payment of interest to its own customers in its Cash Sweeps Program (the "Cash Sweep Program"). As explained below, Janney has underpaid its customers in violation of its fiduciary duties in order to enrich

itself at its customers' expense. In engineering the Cash Sweep Program, Janney has breached and continues to breach its fiduciary obligations by putting its own best interests ahead of its clients.

2. In a typical cash sweep program, the uninvested cash balance from a customer's account is transferred into an interest-bearing account that generates returns for the client, consistent with market-based factors. Janney, however, has structured its Cash Sweep Program to ensure that it, in partnership with a network of banks and clearing firms, diverts the outsized returns to itself.

3. The Cash Sweep Program operates as follows. Janney takes money out of client accounts and gives it to a list of selected banks to invest or loan out (the "Program Banks" or "Participating Banks"). Janney and the Program Banks then reap the interest that the banks earn by investing or loaning their clients' money to third parties. Only a fraction of that interest is paid out to Janney's actual customers. Instead, Janney and the Program Banks keep the "spread" or the difference between the market rates of interest the Program Banks earn on their loans and investments and the rates paid out to the clients. At all relevant times, the rate of interest that Janney earns on its customers' cash has been significantly higher than what it paid out to customers. In fact, the rate of interest Defendant kept for itself was as high as ***80 times the rate paid to customers*** during the relevant period. While remarkably profitable for Defendant, the Cash Sweep Program violates common law, federal law, and industry regulations, including Janney's fiduciary and contractual obligations to its clients.

4. Janney promises its customers that "interest rates" on swept funds "will vary based upon prevailing economic and business conditions." Yet, during the rising interest rate environment from March 2022 through the present, the profits that Janney earned on its customers' cash have grown exponentially. Rising interest rates should have presented an opportunity for

Janney's customers to earn more on their uninvested cash. However, Defendant continues to exploit this opportunity for its own benefit, extracting the high rates of interest for itself and thwarting its customers from receiving the reasonable returns they were legally entitled to. Defendant disguises the returns it keeps as "fees" for administering the Cash Sweep Program. However, in reality, it receives kickbacks from the Program Banks on the profits they are able to obtain by investing or loaning out customers' cash at significantly higher rates of interest. By improperly keeping the interest rates paid on the cash sweep accounts low and sharing the interest profit with the Program Banks, Defendant aligns itself with the banks to maximize its own profits, rather than the customers to which it owes contractual and fiduciary duties.

5. Similar cash sweep practices have drawn scrutiny from the SEC and resulted in tens of millions of dollars in fines. According to a January 17, 2025 announcement, the SEC fined Wells Fargo Advisors and Merrill Lynch a combined $60 million for failing to pay advisory customers a fair rate on cash sweeps. Wells Fargo agreed to pay $35 million, including $7 million tied to violations at its independent Financial Network channel. Merrill paid a civil penalty of $25 million. As Janney has done, Wells Fargo and Merrill Lynch automatically swept customer cash to a bank deposit program with yields that were as much as 4% lower than reasonable alternatives.

6. Janney's misconduct constitutes an ongoing series of breaches of its fiduciary duties and contractual obligations, which require the Defendant to act in the best interests of its clients, and not itself. Plaintiffs, individually and on behalf of the other Class members, hereby bring this class action to remedy the significant financial harm caused by Defendant's use of the Cash Sweep Program to enrich itself at the cost of its own clients.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005. There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and at least one or more members of the proposed Class is a citizen of a different state than at least one Defendant.

8. The Court has personal jurisdiction and venue over Defendant because Janney has its principal place of business, regularly transacts business here and/or caused harm to persons and entities in this District.

9. Venue is also proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events and/or relevant conduct giving rise to the claims at issue occurred in this District and because Defendant is subject to the personal jurisdiction of this Court.

## III. PARTIES

### A. Plaintiffs

10. Plaintiff Michelle Corkum is a citizen of Pennsylvania, who maintains an individual brokerage account at Janney. Ms. Corkum's cash balances in her Janney account were, at times, automatically "swept" into the Cash Sweep Program and she received unreasonably low interest on those deposits.

11. Plaintiff Martin Pesce is a citizen of Philadelphia, who maintained an advisory individual retirement account ("IRA") at Janney. Mr. Pesce's cash balances in his Janney account were, at times, automatically "swept" into the Cash Sweep Program and he received unreasonably low interest on those deposits.

**B. Defendant**

12. Janney Montgomery Scott LLC is registered with the SEC as an investment adviser and broker-dealer and is a member of Financial Industry Regulatory Authority ("FINRA"). It is a limited liability company organized under the laws of Delaware and headquartered in Philadelphia, Pennsylvania.

13. Janney operates, manages, and runs the Cash Sweep Program.

## IV. FACTUAL BACKGROUND

**A. Janney**

14. During the relevant time period, Janney offered brokerage and investment advisory services to customers through over 900 financial professionals in 128 offices across 21 states.

15. Janney represents that it has over $171 billion in client assets under advisement.

16. At issue in this complaint are two ways in which Janney does business.

17. The first is acting as an investment adviser registered with the SEC. As Janney describes in its Form CRS: "For advisory services, [customers] are charged an asset-based advisory fee. Janney generally charges a wrap fee based on a percentage of the assets in [customers] advisory account."[1]

18. The second is as a broker-dealer. Janney explains: "For brokerage services, the primary costs [a customer] will incur are transaction-based commissions for securities trades. Depending on the type of investment [customer] select, costs can include up-front commissions

[1] https://www.janney.com/wealth-management/disclosures-agreements/relationship-summary-regulation-best-interest/relationship-summary (last accessed July 31, 2026)

for the purchase and sale of securities, syndicate related costs, as well as fees that are charged on an on-going basis for as long as you hold the investment."[2]

## B. Defendant's Duties to Its Clients

### 1. Janney When Acting as Investment Adviser Owes Fiduciary Duties to its Clients

19. Janney offers investment advisory services to retail or individual customers as SEC-registered investment advisers.

20. Janney is registered as an investment adviser with the SEC, SEC File No. 801-7258, in order to offer investment advisory products and services to its advisory clients, including Mr. Pesce and Mr. Brown.

21. Under the Investment Advisers Act of 1940 (the "Advisers Act" or the "1940 Act"), Janney owed fiduciary duties to advisory clients, as Janney acknowledges:

> When you engage in an advisory relationship, you will pay an asset-based fee which encompasses, among other things, a defined investment strategy, ongoing monitoring, and performance reporting. Your Financial Advisor will serve in a fiduciary capacity for your advisory accounts.[3]

22. Investment advisers such as Janney are fiduciaries under the 1940 Act during the relevant period. *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also* Sec. and Exch. Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers, Securities Act Release No. 5248, Investment Company Act No. 5248, 2019 WL 3779889, at *1 (June 5, 2019) ("Under federal law, an investment adviser is a fiduciary.").

---

[2] *Id.*

[3] https://www.janney.com/wealth-management/solutions/overview-of-investment-options (last accessed July 31, 2026).

23. The investment adviser's fiduciary duty "is broad and applies to the entire adviser-client relationship." This fiduciary duty is "based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id.* at *2.

24. The fiduciary duty an investment adviser owes to its client under the 1940 Act specifically encompasses a duty of care and duty of loyalty.

25. As the SEC has stated, "[t]his means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at *3.

26. Under an investment adviser's duty of loyalty, "an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.* at *3, *8.

27. However, in certain situations disclosure is simply not sufficient, and "[f]or retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable." Where an investment advisor such as Janney "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then it "should either *eliminate* the conflict or adequately *mitigate* (i.e., modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible." (Emphasis in original). *Id.* at *9.

28. The investment adviser's duty of care includes among other things: "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute

client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship." *Id.* at *4.

**2. Janney When Acting as a Broker-Dealer Owes Duties to Act in the Best Interests of Its Clients**

29. Substantially similar duties are imposed on Janney under broker-dealer law. When Janney is acting in its capacity as a broker-dealer, Janney is obligated to act in its clients' best interests under Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33381-01 (July 12, 2019) ("Reg BI"). *See* 17 C.F.R. §240.15l-1.

30. Although the specific application of Reg BI and the fiduciary standard under the 1940 Act may differ in some respects, "they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[4]

31. Under Reg BI, "a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests" when making a recommendation to retail clients. 84 Fed. Reg. at 33320.

32. Over the past several years, the SEC has repeatedly highlighted the conflicts of interest financial institutions must appropriately manage under Reg BI. Per the SEC's guidance, "[u]nder *both Reg BI and the IA fiduciary standard*," broker-dealers and investment advisers "may recommend an account to a retail investor only when [they] have a reasonable basis to believe that the account is in the retail investor's best interest."

33. Among other things, under Regulation Best Interest, broker-dealers like Janney must "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether

[4] *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations, SEC (last updated Apr. 30, 2024), www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

it has a reasonable basis for making the recommendation," 84 Fed. Reg. 33318, 33321. This includes making recommendations in the client's best interest with respect to a particular Cash Sweep Program.

34. When placing clients' cash into a cash sweep program, Janney's obligations with respect to making recommendations in accordance with Regulation Best Interest are underscored by an August 2023 SEC Staff Bulletin—Standards of Conduct for Broker-Dealer and Investment Advisers Account Recommendations for Retail Investors.

35. In the Staff Bulletin, the SEC called out the operation of Cash Sweep Programs in two separate instances as examples of a conflict of interest for broker-dealers and investment advisers, alongside practices such as commissions, markups, revenue sharing and payment for order flow, which are governed by Regulation Best Interest. As the SEC highlighted, broker-dealers are obligated to act in a "retail investor's best interest and not to place their own interests ahead of the investor's interest"; can "recommend an account to a retail investor only when you have a reasonable basis to believe that the account is in the retail investor's best interest"; "cannot recommend an account that is not in a retail investor's best interest solely based on your firm's limited product menu"; "[a]ny limitations on account types considered . . . are material facts that should be disclosed"; and must disclose any compensation they receive on the basis of their Cash Sweep Program.

36. In its account agreements, brochures, forms and other documents, Janney repeatedly acknowledges its obligations to comply with Regulation Best Interest, for example

stating "[w]e are required to act in your best interest and observe high standards of honor and just and equitable principles of trade."[5]

### 3. Janney Has a Duty to Secure a Reasonable Rate of Interest in IRA Accounts

37. Defendant also has a duty to secure a reasonable rate of interest for clients' uninvested cash in IRAs. The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC").

38. Section 4975 of the IRC taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. §4975(c)(1)(E).

39. To provide further clarification on distributions of IRAs, the U.S. Internal Revenue Service ("IRS") explains in Publication 590 that "[g]enerally, a prohibited transaction is any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."

40. A "disqualified person" includes those "providing services to the plan." 26 U.S.C. §4975(e)(2)(B). This includes financial institutions that hold client assets and advisory firms that determine which bank will hold those assets, such as Janney. As IRS Publication 590 explains, "[d]isqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets."

---

[5] https://www.janney.com/wealth-management/disclosures-agreements/relationship-summary-regulation-best-interest/regulation-best-interest-disclosure-regbi (last accessed July 31, 2026)

41. Therefore, under the IRC, Janney was a "disqualified person" and cash sweeps from IRA accounts were "prohibited transactions."

42. IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions." One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution." 26 U.S.C. §4975(d)(4).

43. The U.S. Treasury regulations include a similar requirement where financial institutions such as Janney "invest[] plan assets in deposits in itself or its affiliates." 26 C.F.R. §54.4975-6(b)(3)(i). In such circumstances, the parties' agreement "must name" the bank and "*must state* that such bank or similar financial institution may make investments in deposits which *bear a reasonable rate of interest* in itself (or in an affiliate)." *Id.*

44. In sum, federal law requires that Janney pay its clients a reasonable rate of interest, and Defendant violated those laws by failing to do so on clients' swept cash.

**4. Janney Was Contractually Obligated to Act in Customers' Best Interests Rather Than Its Own**

45. Upon opening a new account with Janney, each customer is provided with standardized contractual documents (the "Account Agreements"), which incorporate among other things, the Janney Cash Sweep Program Documents.

46. Janney's Form Client Relationship Summary ("Form CRS") is also part of the overall contracts with clients.

47. Janney's Form CRS expressly contracts with customers, promising a duty to act in their clients' best interests, consistent with its duties imposed under the 1940 Act, Regulation Best Interest: "When we provide you with a recommendation as your broker-dealer or act as your investment adviser, we have to act in your best interest and not put our interest ahead of yours."

48. Janney further acknowledges its duty to act in its clients' best interest under Reg BI: "We are required to act in your best interest and observe high standards of honor and just and equitable principles of trade."[6]

49. Janney acknowledges "[w]hen Janney acts as an investment adviser, Janney is subject to the Advisers Act. Janney has a fiduciary relationship with you when providing advisory services. When Janney acts as investment adviser, Janney's duties and obligations include, among others, the following:

- Janney must act with utmost care and good faith toward you.
- Janney has a duty to seek to obtain "best execution" of transactions for you.
- Janney must avoid or disclose to you material conflicts of interest."[7]

50. Despite the promises made to clients, Janney did not mitigate conflicts of interest arising from the cash sweep services discussed herein, but rather, profited off of those activities, to the direct detriment of the clients they were required to protect.

### C. Janney's Cash Sweep Program

51. In a typical cash sweep account, the firm moves uninvested cash (*e.g.*, incoming cash deposits, dividends, or certain investment returns) from the customer's account to a money market mutual fund or a bank whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"). Cash sweep accounts are intended to convert idle cash into interest-bearing investment vehicles.

---

[6] https://www.janney.com/wealth-management/disclosures-agreements/relationship-summary-regulation-best-interest/regulation-best-interest-disclosure-regbi (last accessed June 1, 2026)

[7] *Id.*

52. Three types of client relationships employ the Cash Sweep Program at issue here—brokerage accounts, investment advisory accounts, and IRA accounts. For each type, Janney clients often have uninvested cash from a number of different sources. Rather than allowing that cash to sit idle, Janney's Cash Sweep Program ostensibly allows clients to earn interest on that uninvested cash by "sweeping" (i.e., automatically transferring) such cash into a bank deposit account. At Janney, each client relationship shared the same fundamental characteristics in which Janney sweeps its clients' uninvested cash into its Cash Sweep Program and paid unreasonably low rates of interest to those clients on the swept cash.

53. Janney automatically enrolled clients into the Cash Sweep Program upon the opening of clients' accounts: the Insured Sweep was "the default (or sole) cash sweep option" for accounts other than discretionary advisory IRA accounts. The clients' enrollment was automatic unless the client instructed otherwise, at which point clients' cash deposits remain in Free Credit Balances and will not earn interest nor be protected with FDIC insurance.

54. Janney utilized third-party administrators to establish and maintain cash sweep deposits at various Participating Banks and to effect deposits to, withdrawals from and transfers between the deposit accounts at the various Participating Banks.

55. Janney had the sole authority to (a) set the fees it earned from the Cash Sweep Program and (b) set the interest rates that customers receive.

56. Janney contractually promised in its Cash Sweep Documents that it would determine interest rates paid to customers based on "economic and business" conditions:

> Interest rates paid on your cash balances in the Insured Sweep Option are determined daily based upon a variety of factors including the interest rate paid by the Program Banks on the aggregate balances of the Deposit Accounts, the fees charged by Janney and the Administrator and prevailing economic and business conditions.

> . . .
>
> [I]nterest rates on Program Deposits will vary based upon prevailing economic and business conditions.[8]

57. Despite its representation to the contrary, Janney chose *not* to adjust interest rates paid to customers based on prevailing economic and business conditions, but rather has kept the sweep rates artificially depressed so as to reap substantial profits for itself.

58. The chart below shows that when the Federal Funds Rate—the interest rate that banks charge each other to borrow money (discussed in detail in the next section)—increased at the end of 2022, Janney did not make a commensurate move in the interest earned by customers. When the Federal Funds Rate increased, Janney and its Program Banks earned more interest loaning out customer sweep money. Rather than keep their fees for administering the cash sweep program constant and pass through the increased earned interest to customers, Janney and its Program Banks held customer interest rates low and increased the amount they kept.

| Date | Brokerage/Advisory Accounts with Less Than $250k in Cash | Advisory IRA Accounts | Money Market Funds | Fed Funds Rate |
|---|---:|---:|---:|---:|
| 5/13/2022 | 0% | 0.39% | 0.03% | 0.77% |
| 2/9/2023 | 0.75% | 2.70% | 3.64% | 4.57% |
| 10/20/2023 | 0.80% | 3.66% | 4.42% | 5.33% |
| 1/17/2025 | 0.18% | 2.70% | 3.45% | 4.33% |
| 10/13/2025 | 0.05% | 2.46% | 3.21% | 4.09% |
| 6/1/2026 | 0.05% | 1.81% | 2.70% | 3.64% |

59. Janney does not fully disclose the amount of the interest it receives from the investment of customer funds. Rather, it states "Program Banks pay Janney a rate based on the

[8] https://www.janney.com/wealth-management/disclosures-agreements/disclosures-agreements-service/cash-management/janney-cash-sweep-program-disclosures

deposits held at each bank. This rate varies by bank and is typically tied to the Federal Funds rate, plus a spread." This suggests that Janney makes more than the Federal Funds rate.

60. This means that, for example, at the October 2025 rates, Janney made more than 80 times more interest than a brokerage or advisory customer who held less than $250,000 in the cash sweep. Even for Advisory IRA clients, Janney made more than 60% more interest than the clients.

**D. Market Rates of Return**

**1. The Federal Funds Rate**

61. The federal funds market consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, the Federal Funds Rate is the interest rate charged by banks to borrow from each other overnight. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions (the "Federal Funds Rate").

62. From 2018 to 2019, and again from March 2022 to August 2024, the Federal Reserve began significantly raising the effective federal funds rate.

63. By August 2024, the effective Federal Funds Rate had risen to 5.33%. As the chart below shows, while the Federal Reserve began raising the federal rate beginning in 2018 through 2024—up from 0.08% in February 2022 to 5.33% in August 2024—Defendant kept the interest paid to Janney cash sweep account holders drastically lower:




64. While the Federal Funds Rate has declined moderately since the summer of 2024, it is still hovering above 4.30%—significantly above the rates of interest paid by Defendant to its customers under the Cash Sweep Program.

**2. Interest on Short-Term U.S. Treasury Bills**

65. The yield on short-term U.S. Treasury Bills further demonstrates that the rates Janney paid on the Cash Sweep Program were unreasonably low. U.S. Treasury Bills ("T-Bills") are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks. T-Bills are issued at a discount from the face value, and when they mature, the investor is paid the face value.

66. Treasury Bills are considered safe investments because they are backed by the U.S. government, but generally carry low rates of return. Nevertheless, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023. As of December 31, 2024, the one-month treasury rate was set at 4.42% and the three-month rate at 4.31%.

67. By contrast, the interest rate Janney paid under the Cash Sweep Program has remained a fraction of the T-Bill rate.

**3. Money Market Rates, Including Those Offered by Janney**

68. Money market rates are another benchmark for determining a reasonable rate of interest.

69. Money market funds are a type of mutual fund that invests in high-quality, short-term debt instruments and cash equivalents, such as U.S. Treasury Bills.

70. The rate of return for a money market mutual fund is typically shown for a seven-day period, referred to as the "7-day yield," and is typically expressed as an annual percentage rate.

71. Outside of the Cash Sweep Program, Janney offered money market mutual funds (the "Money Market Funds"). However, the Money Market Funds were only the default product or "available for use as a core account investment vehicle" for a very narrow set of account types not held by many individual investors: ERISA Title I accounts, 403(b)(7) plans, and Keogh Plans.

72. Recognizing that it would be breaching fiduciary duties by putting ERISA-covered plans into the Cash Sweep Program, Janney required those accounts to be swept into a different account. "ERISA Advisory Accounts that participate in Janney's cash management program are eligible to purchase shares of a money market mutual fund."[9] Yet even those accounts were still paying lower rates to customers and higher fees to Janney than a true money market. *See* Paragraph 57.

---

[9] https://www.janney.com/docs/default-source/client-resources-disclosures/disclosures-agreements-by-account-type/managed-accounts/janney-investment-management-disclosure-brochure.pdf?sfvrsn=b99092bf_43 (last accessed July 31, 2026)

**4. Other Institutions' Cash Sweep Account Interest Rates**

73. The sweep interest rates paid by Janney's competitors, who offered FDIC-insured sweep accounts similar to those in the Janney Cash Sweep Program, demonstrate that the rates offered by Defendant were unreasonably low. Indeed, sweep rates offered by other financial institutions highlight the uncompetitiveness and unreasonableness of Defendant's Cash Sweep Program, and demonstrate that Janney stands out among the worst of the worst in an already uncompetitive industry.

74. For example, as the Federal Reserve raised the Federal Funds Rate, Fidelity Investments and R.W. Baird increased the rates of interest they pay to customers from 2022 to 2024, offering significantly higher rates than Janney for similar Cash Sweep Programs.

75. As of February 2025, competitor Webull's rate was 3.75%, Vanguard's rate was 3.65%, Fidelity's rate was 2.19%, and Robert W. Baird's rate is between 1.45% and 2.89%. Janney is paying as little as 0.05%.

76. Additionally, Fidelity also offers to automatically sweep customers' cash into a money market mutual fund with a current 7-day yield of 3.30%, as of early July 2026. Vanguard offers to automatically sweep customers' cash into one of five money market mutual funds with current 7-day yields ranging from 1.65% to 3.64%, and Baird automatically sweeps certain eligible customers into a money market mutual fund with a current 7-day yield of 3.51%.

77. As these competitor rates show, other brokerage and advisory financial institutions that have Cash Sweep Programs pay or secure significantly higher interest rates than Janney.

78. Like Fidelity, Vanguard, and Baird, Janney could have automatically swept cash to banks that pay market rates, or allowed all customers to sweep to a money market mutual fund. Money market mutual funds are strictly regulated by the SEC and can only be sold pursuant to

prospectuses, which disclose the sponsor's profits on the use of investor cash, in contrast to Janney's Program, which is a black box, and does not disclose the significant spread, for example, between the rates paid on cash and the Federal Funds Rate or rates paid by other competitors' lending businesses.

**5. The Interest Rate Applicable to Short-term Instruments, Such as Repurchase Agreements**

79. A repurchase agreement ("repo") is a short-term secured loan, where one party sells securities to another and agrees to repurchase those securities later at a higher price. In simple terms, a repo is an exchange of a security (which acts as collateral) for cash.

80. Banks, dealers, other financial institutions, and corporate investors commonly use repos to finance their securities inventories, obtain short-term funding, and/or meet regulatory requirements. Typically, high-quality debt securities are used as collateral in a repo, such as government bonds, agency bonds, supranational bonds, corporate bonds, convertible bonds, and emerging market bonds.

81. The U.S. overnight repo rate, set by the Federal Reserve, represents the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to a high of 5.55% in December 2023. As of January 8, 2025, the U.S. overnight repo rate was 4.25% which is significantly above the interest rate paid by Defendant to account holders in the Cash Sweep Program.

**6. The Secured Overnight Financing Rate**

82. Janney also paid rates under the Cash Sweep Program that have been and remain significantly below several other objective indicia of reasonableness, including the Secured Overnight Financing Rate ("SOFR") rate.

83. SOFR measures the cost of borrowing cash overnight collateralized by Treasury securities and is calculated from a very large volume of actual repurchased transactions.[10] It is widely regarded as the best measure of the marginal cost of secured overnight funding in U.S. dollar markets. Importantly, SOFR is a market rate that Federal Reserve publications emphasize is the most representative measure of short-term funding conditions precisely because it is grounded in actual trades, rather than quotes or estimates.[11]

84. Moreover, the sharp increases in the effective Federal Funds rate and SOFR beginning in 2022 and continuing through the present produced little to no increase in the rates paid under the Program. Indeed, as discussed above, the rates paid by Defendant barely changed, if at all, even while short-term interest rate conditions improved drastically during the relevant time period. In addition to the Federal Funds Rate discussed above, the rates paid under the Program have been and remain significantly below several other objective indicia of reasonableness, including, by way of example: (a) SOFR rates, including the 180-day average SOFR rate currently at 3.67%,[12] as of July 11, 2026; (b) Treasury bill rates, including the three-month and one-year rates currently at 3.70% and 3.83%, respectively, as of June 25, 2026;[13] and

---

[10] Federal Reserve Bank of New York, Secured Overnight Financing Rate, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited July 31, 2026).

[11] Federal Reserve Bank of New York, *An Updated User's Guide to SOFR* (Feb. 2021), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf.

[12] SOFR Academy, *Market Data*, https://sofracademy.com/current-sofr-rates/ (last visited July 31, 2026).

[13] Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis*, https://fred.stlouisfed.org/series/DTB3 (last visited July 31, 2026); Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis*, https://fred.stlouisfed.org/series/DTB1YR (last visited July 31, 2026).

(c) the overnight interest rate at which the Federal Reserve repurchases securities from private banks (*i.e.*, the "repo" rate), which is currently 3.50%, as of June 25, 2026.[14] Short-term interest rates for these other federal financial instruments experienced steep rate increases from 2022 to the present.

**E. Janney Breached Its Contractual Obligations to All Customers**

85. Janney breached and continues to breach its contractual obligations by creating and operating the Cash Sweep Program to enrich itself at the expense of its customers, while failing to pay reasonable rates of interest on its clients' cash deposits. Janney was required but failed to put its customers' interests ahead of its own in engineering, operating, maintaining, and recommending the Cash Sweep Program. Janney was also required to pay reasonable rates of interest to its clients — adjusted accordingly based on prevailing market conditions.

86. As explained above, the rates paid by Janney were unreasonable even in a low interest rate environment and were far less than rates offered by competing sweep accounts.

87. Moreover, the rates of interest paid to Janney customers were net of "fees" or the rates of interest paid by the Program Banks to Janney. These "fees" that the Defendant reaped from its customers' cash were significantly higher than the rate of interest paid to those customers.

88. Under its Cash Sweep Disclosure, Janney had a contractual obligation to adjust interest rates paid to customers based on "prevailing economic and business conditions." When the Federal Funds Rate began to climb in 2022, Janney breached its contract with customers by failing to adjust those rates in step. When the Federal Funds Rate increased, Janney could make a higher interest rate when it loaned out customer money. Rather than pass the higher interest

[14] Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate*: *Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations*, https://fred.stlouisfed.org/series/RRPONTSYAWARD (last visited July 31, 2026).

earnings on to customers, Janney continued to keep customer interest artificially low and pocketed an ever-larger portion for itself and the Program Banks.

89. An interest rate is reasonable if it is based on a fair market valuation. As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

90. The U.S. Department of Labor defines a "reasonable" rate of interest as:

> a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

91. Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."

92. Thus, under these terms, and any fair interpretation of what a "reasonable" rate of interest is, Defendant has not secured or paid a reasonable rate of interest to its customers, including Plaintiffs and the Class. The Cash Sweep Program has paid well below the prevailing or market interest rates.

93. Defendant's rates of interest in the Cash Sweep Program were also below objective measures of reasonableness, including the leading indicators set forth above. These benchmarks demonstrate that the rates of interest in the Cash Sweep Program were not fair or reasonable, and did not properly take into account economic and market conditions, despite Janney's contractual promise that it would do so.

94. As a result, Plaintiffs and the Class suffered damages by receiving far lower interest payments than they would have received if Janney had adjusted rates in accordance with economic conditions and the sweep interest rates were reasonable or fair.

### F. The Cash Sweep Program Unfairly Benefits Janney in Breach of Its Fiduciary Duties to Advisory Clients

95. Janney has intentionally structured the Cash Sweep Program with the Program Banks for its own financial benefit, to the detriment of its customers, by keeping the interest rates for its cash sweep accounts artificially low, while earning higher interest rates on those deposits in the form of "fees" paid by the Program Banks.

96. First, the Program Banks benefit from the significant amount of cash that Janney makes available to them through the Cash Sweep Program, which Plaintiffs believe to be in the hundreds of millions of dollars. This massive cash in-flow provides the Program Banks with a relatively stable source of deposits. Program Banks in turn use the deposited cash for their investment or lending activities, thus driving substantial revenue for the Program Banks.

97. Second, Janney profits from the spread, a significant portion of which it continues to keep for itself, at the expense of its customers, as "fees" charged for the Cash Sweep Program. Janney, its third-party administrators, and the Program Banks all share in the fees and generate significant income. This income in the form of fees is paid by the Program Banks to Janney.

98. Janney's Cash Sweep Disclosure tells customers "[t]he fees received by Janney and the Administrator with respect to the Insured Sweep Option will be greater than, and negatively affect, the interest rate you receive on your Deposit Accounts." In other words, these fees *reduce the interest paid on customers' cash balances* in the Cash Sweep Program.

99. The conflict of interest is exemplified by the significant profits Janney is able to generate from the Cash Sweep Program in comparison to other types of products.

100. As to Advisory IRA Accounts and other investment advisory accounts, Janney earned two layers of fees on the same cash balances: compensation from the Cash Sweep Program ***and*** advisory fees paid to Janney as investment adviser.

101. Janney has thus established a practice whereby Janney *makes significant profits on its client cash balances whereas the client*, to whom a fiduciary duty or duty to act in the client's best interest is owed, *loses money* on their cash balances compared to other instruments of comparable risk, because the interest the client earns in their cash sweep account is less than the fees Janney collects. This is a breach of its fiduciary duties to advisory clients.

102. The "fees" that Janney collects under the Cash Sweep Program are, in effect, profits shared by the Program Banks. Janney profits from the difference in rates of interest, at the expense of its customers.

103. To put this in perspective, customers who deposited their cash under the Cash Sweep Program received only 0.05% in interest for assets below $250,000 as of October 2025. By contrast, Defendant received interest at least equal to a rate of interest of 4.09% at that same time —***81 times the rate paid to their customers***.

104. Janney knew that its customers in the Cash Sweep Program received artificially depressed rates of interest, as low as 0.05%, and yet, purposefully designed the Cash Sweep Program to maximize the returns they received, at the expense of its customers.

105. Through any reasonable means of interpretation and construction, Janney failed to pay any reasonable rate to their customers through the Program.

## V. CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of:

> All Janney customers who had cash deposits or balances in the Cash Sweep Program during the applicable statute of limitations period (the "Class").

107. Plaintiffs also bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(5), on behalf of the following subclass:

> All Janney customers who had cash deposits or balances in the Cash Sweep Program in an account in which Janney acted as an investment advisor during the applicable statute of limitations period (the "Advisory Subclass").

108. Unless otherwise indicated or the context requires otherwise, references herein to the "Class" include both the Class and the Advisory Subclass.

109. Excluded from the Class are Defendant, including any of its affiliates, officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest.

110. Plaintiffs reserve the right to amend the Class definition upon conducting further investigation or discovery.

111. The members of the Class are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

112. Defendant has thousands of customers nationwide and oversees more than $170 billion in client assets through thousands of financial advisors. The Class thus satisfies the numerosity requirement of Rule 23.

113. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, members of the Class may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail or electronically. Defendant regularly communicates with the Class by mail and/or electronically.

114. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) Whether Defendant owed fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(b) Whether Defendant breached its fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(c) Whether Defendant breached the contractual terms of its account agreements and other written communications to Class members;

(d) Whether Defendant breached the implied covenant of good faith and fair dealing;

(e) Whether the interest rates paid to Class members under the Cash Sweep Program were fair and reasonable;

(f) Whether Defendant was unjustly enriched by its wrongful conduct;

(g) Whether this case may be maintained as a class action under Federal Rule of Civil Procedure 23;

(h) Whether and to what extent Plaintiffs and the other Class members have sustained damages and the proper measure of damages; and

(i) Whether and to what extent Plaintiffs and the other Class members are entitled to attorneys' fees and costs.

115. Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the Class sustained damages as a result of Defendant's wrongful conduct since Plaintiffs were or are customers of Defendant and had their cash balances improperly managed by Defendant through their administration of the Cash Sweep Program. Thus, Plaintiffs' claims are typical of the claims of the other Class members, because all Class members are similarly affected by

Defendant's wrongful conduct, and the relief Plaintiffs seek for the Class is common to all Class members.

116. Plaintiffs will fairly and adequately protect the interests of other Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Plaintiffs have no interests adverse or antagonistic to those of the Class.

117. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

118. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or may substantially impair or impede their ability to protect their interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI. CLAIMS ALLEGED

**<u>FIRST CAUSE OF ACTION</u>**
**Breach of Contract**
**(On Behalf of Plaintiffs and the Class)**

119. Plaintiffs reallege and incorporate by reference the allegations set forth in ¶¶ 1-118 above.

120. Janney's governing documents related to the Cash Sweep Program, including their Form CRS, constitute a binding agreement between Janney and its accountholders.

121. The governing documents require Janney to act in a client's best interest and not its own.

122. The governing documents also require that Janney periodically review and adjust interest rates paid to Plaintiffs and the Class under the Cash Sweep Program based on economic and market conditions.

123. As set forth herein, Janney (i) failed to place its clients' interests ahead of its own by creating, structuring, operating and maintaining the Cash Sweep Program for its own benefit and to the detriment of its clients; and (ii) failed to pay Plaintiffs and the Class interest rates on their Cash Sweep Program holdings that accounted for economic and market conditions. Therefore, Janney breached the contracts.

124. Janney's past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the Class.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and the Class)**

125. Plaintiffs reallege and incorporate by reference the allegations set forth in ¶¶ 1-118 above.

126. A covenant of good faith and fair dealing is implied into every contract.

127. Implicit in these documents were duties of good faith and fair dealing, including a duty not to exercise their discretion for an improper purpose. The Program Documents vested Janney with discretion over, among other things, the selection of Program Banks, the allocation and placement of customer cash, the establishment of interest rate tiers, the determination of sweep rates, and the assessment or allocation of sweep-related fees. Janney exercised that discretion arbitrarily, opportunistically, and for its own financial benefit rather than for the purposes contemplated by the Program Documents.

128. Specifically, Janney used its contractual discretion to maintain artificially low and stagnant sweep rates while retaining, diverting, or permitting affiliated entities and service providers to retain the substantial economic value generated by customer cash, even as short-term interest rates and comparable cash sweep programs increased significantly. By exercising their contractual discretion in this manner, Janney frustrated Plaintiffs' and the Class's objectively reasonable contractual expectations, deprived them of the benefits the Program Documents were intended to provide, and breached the duties imposed by the Program Documents and applicable law.

129. As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the Class sustained damages by failing to receive reasonable market interest rates.

## <u>THIRD CAUSE OF ACTION</u>
## Breach of Fiduciary Duty
## (On Behalf of Plaintiff Pesce and the Advisory Subclass)

130. Plaintiffs reallege and incorporate by reference the allegations set forth in ¶¶1-118 above.

131. At all relevant times, Janney owed fiduciary duties to Plaintiff Pesce and the other Advisory Subclass with respect to the Cash Sweep Program.

132. As fiduciaries, Janney owed Plaintiff Pesce and the other Advisory Subclass members a duty of loyalty, a duty of care, and good faith, as well as a duty to act in the Plaintiff and other Class members' best interest and not put Janney's interests ahead of Plaintiffs and the Class.

133. Defendant breached its fiduciary duties by the conduct alleged herein, including by: (i) designing, structuring, maintaining, and/or operating the Cash Sweep Program to benefit itself at the expense of Plaintiff Pesce and the other Advisory Subclass; (ii) failing to pay or secure for Plaintiff Pesce and the other Advisory Subclass a reasonable rate of interest.

134. Janney breached its fiduciary duty to the Advisory Subclass by taking fees worth many times the amount of interest that its clients received.

135. Janney breached its fiduciary duty to the Advisory Subclass by failing to match money market rates with its sweep account when a money market alternative was available.

136. Janney's past, continuous, and ongoing breaches of fiduciary duties damaged Plaintiff Pesce and the other Advisory Subclass.

137. As a direct and proximate consequence of Janney's conduct as alleged herein, Plaintiff Pesce and the other Advisory Subclass suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Janney, punitive damages, as well as all other equitable relief deemed just and proper.

## VII. REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, requests relief as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested

herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Ordering Defendant to pay actual damages (including punitive damages) and restitution to Plaintiffs and the other Class members, as allowable by law;

C. Ordering disgorgement of profits obtained by Defendant as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Ordering injunctive relief prohibiting Defendant from continuing to engage in the conduct alleged herein;

E. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. Ordering Defendant to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as may be just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 31, 2026

Respectfully submitted,

*<u>/s/ Michael Acciavatti</u>*
Michael Acciavatti, PA Bar No. 324112
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
(610) 842-5801
macciavatti@milberg.com

*Local Counsel for Plaintiffs and the Proposed Class*

Jason T. Dennett (*admitted pro hac vice*)
**MILBERG, PLLC**
1700 7th Avenue, Suite 2100
Seattle, WA 98101
(516) 515-9124
jdennett@milberg.com

Gabriel Mandler (*admitted pro hac vice*)
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave, Suite 417
Aventura, FL 33180
Tel.: (786) 289-9469
gabriel@edelsberglaw.com

Alexander E. Barnett*
Jarett N. Sena*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
abarnett@dicellolevitt.com
jsena@dicellolevitt.com

**pro hac vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2026, the foregoing was filed with the Clerk of the Court using CM/ECF, which will send notice to the registered attorneys of record that the document has been filed and is available for viewing and downloading.

*/s/ Michael Acciavatti*
Michael Acciavatti

*Local Counsel for Plaintiffs and the Proposed Class*